James E. Cecchi, Esq.
Kevin G. Cooper, Esq.
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: JCecchi@carellabyrne.com
        KCooper@carellabyrne.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TYLER BAKER, ANNETTE NOKES, ROBERT BOTTERILL, SOPHIA PORTER, ANNA SWARTZ, MIKE XAVIER, BRIAN SLAFTER, HEIDI HUMPHREYS, FRANK ORTEGA, and MICHAEL TAILLARD, on behalf of themselves and a class of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> JOHNSON & JOHNSON CONSUMER INC., <br><br> Defendant. | Civil Action No. <br><br> **COMPLAINT and** <br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Tyler Baker, Annette Nokes, Robert Botterill, Sophia Porter, Anna Swartz, Mike Xavier, Brian Slafter, Heidi Humphreys, Frank Ortega, and Michael Taillard collectively, "Plaintiffs") individually and on behalf of themselves and all others similarly situated, bring this class action lawsuit against Defendant Johnson & Johnson Consumer Inc. ("J&J" or "Defendant") based upon personal knowledge as to themselves, the investigation of their counsel, and on information and belief as to all other matters.

## INTRODUCTION

1.    This is a class action lawsuit against Defendant regarding the manufacture, distribution, and sale of its Neutrogena and Aveeno sunscreen products that contain benzene, a known human carcinogen.[1]

2.    Skin cancer is the most common form of cancer in the United States and according to a report from the Office of the Surgeon General, approximately 4.3 million people are treated for basal cell cancer and squamous cell skin cancer in the U.S. every year.[2]

3.    According to the American Academy of Dermatology ("AAD"), everyone needs to wear sunscreen.[3]  Anyone can get skin cancer regardless of age, gender, or race, and "sunscreen use can help prevent skin cancer by protecting you from the sun's harmful ultraviolet rays."[4]

4.    Sunscreen products are regulated as over-the-counter drugs by the U.S. Food and Drug Administration ("FDA").[5]  The FDA has several safety and effectiveness regulations in place

---

[1] The products at issue include: Neutrogena Ultra Sheer Weightless Sunscreen Spray, SPF 100+, Neutrogena Ultra Sheer Weightless Sunscreen Spray, SPF 70, Neutrogena Ultra Sheer Body Mist Sunscreen Broad Spectrum SPF 45, Neutrogena Ultra Sheer Body Mist Sunscreen Broad Spectrum SPF 30 Spray, Neutrogena Ultra Sheer Dry-Touch Water Resistant Sunscreen SPF 70, Neutrogena Beach Defense Oil-Free Body Sunscreen Spray - SPF 100, Neutrogena Beach Defense Spray Body Sunscreen SPF 70, Neutrogena Beach Defense Spray Body Sunscreen SPF 30, Neutrogena Beach Defense Spray Body Sunscreen SPF 50, Neutrogena Invisible Daily Defense Body Sunscreen Broad Spectrum SPF 60+, Neutrogena CoolDry Sport Water-Resistant Sunscreen Spray SPF 70, Neutrogena CoolDry Sport Water-Resistant Sunscreen Spray SPF 50, Neutrogena CoolDry Sport Water-Resistant Sunscreen Spray SPF 100, and Aveeno  Protect + Refresh Spray SPF 60 (the "Affected Products"). Plaintiffs reserve the right to amend this list if further investigation and/or discovery reveals that the list should be amended.
[2] *Tips to Stay Safe in the Sun: From Sunscreen to Sunglasses*, U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/consumers/consumer-updates/tips-stay-safe-sun-sunscreen-sunglasses?gclid=CjwKCAjwwqaGBhBKEiwAMk-FtF7PGr (last visited July 29, 2021)
[3] *Sunscreen FAQS*, AMERICAN ACADEMY of DERMATOLOGY ASSOCIATION, https://www.aad.org/public/everyday-care/sun-protection/sunscreen-patients/sunscreen-faqs (last visited July 29, 2021)
[4] *Id.*
[5] *See* 21 C.F.R. § 352, *et seq.*

that govern the manufacture and marketing of all sunscreen products, including safety data on its ingredients.[6]

5.      On May 24, 2021, Valisure, an independent pharmacy that analyzes the safety of consumer products, filed a citizen petition with the FDA detailing its findings that it detected high levels of benzene in many sunscreen and after-sun care products, including several of Defendant's sunscreen products.  Valisure called for the FDA to recall all batches of Defendant's products that contained benzene on the basis that they are adulterated under Section 501 of the Federal Drug and Cosmetics Act ("FDCA") in violation of 21 U.S.C. § 351, and misbranded under Section 502 of the FDCA in violation of 21 U.S.C. § 352.

6.      Benzene is a known human carcinogen.  The World Health Organization ("WHO") and the International Agency for Research on Cancer ("IARC") have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[7]  Similarly, the Department of Health and Human Services ("DHHS") has determined that benzene causes cancer in humans.[8] Benzene exposure has been linked with acute lymphocytic leukemia, chronic lymphocytic leukemia, multiple myeloma, and non-Hodgkin lymphoma.[9]

7.      According to Valisure, because many of the products it tested did not contain detectable levels of benzene, it appears that benzene is not a requisite component of manufacturing

---

[6] *Id.; see also Tips to Stay Safe in the Sun: From Sunscreen to Sunglasses*, U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/consumers/consumer-updates/tips-stay-safe-sun-sunscreen-sunglasses?gclid=CjwKCAjwwqaGBhBKEiwAMk-FtF7PGr (last visited July 29, 2021)
[7] *IARC Monographs on the Identification of Carcinogenic Hazards to Humans: List of Classifications*, INTERNATIONAL AGENCY FOR RESEARCH ON CANCER, WORLD HEALTH ORGANIZATION, https://monographs.iarc.who.int/list-of-classifications (last visited July 29, 2021)
[8] *Facts About Benzene,* CENTERS FOR DISEASE CONTROL AND PREVENTION (April 4, 2018) https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last visited July 29, 2021)
[9] *Benzene and Cancer Ris*k, AMERICAN CANCER SOCIETY https://www.cancer.org/cancer/cancer-causes/benzene.html (last visited July 29, 2021)

or packaging sunscreen.[10]   As such, "[a]ny significant detection of benzene should be deemed unacceptable."[11]

8.      David Light, Founder and CEO of Valisure stated that "[t]he presence of this known human carcinogen in products widely recommended for the prevention of skin cancer and that are regularly used by adults and children is very troubling[.]"[12]

9.      The presence of benzene in the Affected Products is not disclosed on the Affected Products' labels.  Therefore, Plaintiffs, by use of reasonable care, could not have discovered that the Affected Products were contaminated with Benzene.

10.      Plaintiffs and Class members purchased the Affected Products with the expectation that the products were safe, including free of carcinogens. Because Defendant sold products to consumers that contain dangerous levels of benzene, Plaintiffs and the Classes were deprived of the benefit of their bargain.

11.      Despite Valisure's extensive testing and reporting on the presence of benzene in the Affected Products, J&J waited nearly two months to warn members of the public of – or take any action whatsoever – regarding the risks to their health or safety.  This two-month delay spanned two major holiday weekends, Memorial Day weekend and July 4th weekend, events which Defendant reasonably expected would elevate consumer demand for and sales of sunscreen products.

---

[10] David Light, Kaury Kucera, PhD, and Quian Wu, PhD, *Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products* (May 24, 2021), https://www.valisure.com/wp-content/uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf (last visited July 29, 2021).
[11] *Id.*
[12] *Valisure Detects Benzene in Sunscreen*, VALISURE (May 25, 2021) https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen/ (last visited July 29, 2021).

12.     On July 14, 2021, Defendant finally acknowledged Valisure's findings and issued a recall of certain, but not all,[13] of its products that contain benzene.  Defendant recalled five of its product lines, including Neutrogena Beach Defense® aerosol sunscreen, Neutrogena Cool Dry Sport aerosol sunscreen, Neutrogena Invisible Daily™ defense aerosol sunscreen, Neutrogena Ultra Sheer® aerosol sunscreen, and Aveeno Protect + Refresh aerosol sunscreen.[14]

13.     In order to prevent Defendant from selling misbranded, illegal, and dangerous products in the future, Plaintiffs seek injunctive relief including, but not limited to requiring Defendant to improve internal testing protocols and also requiring independent testing of its products to ensure that its sunscreen products are free of benzene before they are sold.

14.     Accordingly, Plaintiffs bring this action on behalf of themselves and the Class for equitable relief and to recover damages and restitution for: (i) breach of express warranty; (ii) breach of implied warranty; (iii) violation of New Jersey's Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 *et seq*.; (iv) violation of Vermont's Consumer Fraud Act, VT. Stat. Ann. Tit. 9, § 2451 *et seq*.;  (v) violation of Michigan's Consumer Protection Act, Mich. Comp. Laws Ann. § 445.903 *et seq*.; (vi) violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. §§ 201-2 & 201-3, *et seq*.;  (vii) violation of South Carolina's Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq*.; (viii) violation of Maryland's Consumer Protection Act,

---

[13] David Light, Kaury Kucera, PhD, and Quian Wu, PhD, *Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products* (May 24, 2021), https://www.valisure.com/wp-content/uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf (last visited July 29, 2021). To date, Defendant has not recalled Ultra Sheer Dry-Touch Water Resistant Sunscreen SPF 70. The recall further requires receipts for submissions over a number threshold unilaterally set by J&J.
[14] Press Release, JOHNSON & JOHNSON, *Johnson & Johnson Consumer Inc. Issues Voluntary Recall of Specific NEUTROGENA® and AVEENO® Aerosol Sunscreen Products Due to the Presence of Benzene* (July 14, 2021) (https://www.jnj.com/johnson-johnson-consumer-inc-issues-voluntary-recall-of-specific-neutrogena-and-aveeno-aerosol-sunscreen-products-due-to-the-presence-of-benzene) (last visited July 29, 2021).

MD. Comm. Code § 13-301 *et seq*.; (ix) violation of Hawaii's Unfair Practices and Unfair Competition Act, Haw. Rev. Stat. § 480-1 *et seq*.; (x) violation of Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILL. Comp. Stat. §§ 505 *et seq*. (xi) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (xii) violation of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.; and (xiii) unjust enrichment.

## **PARTIES**

15.     Plaintiff Tyler Baker is a resident and citizen of the state of Vermont.  In May 2019, Mr. Baker purchased Aveeno Protect + Refresh Sunscreen Spray SPF 60 from a Walmart retail store located in Williston, Vermont.  In May 2020, Plaintiff Baker purchased Aveeno Protect + Refresh Sunscreen Spray SPF 60 from a Hannaford Supermarket and Pharmacy retail store located in South Burlington, Vermont. When purchasing the Affected Products, Mr. Baker reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendant that the products were properly manufactured, free from defects, and safe for their intended use. Mr. Baker relied on these representations and warranties in deciding to purchase the products and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Affected Products from Defendant if he had known that they were not, in fact, properly manufactured, free from defects, or safe for their intended use.

16.     Plaintiff Annette Nokes is a resident and citizen of the state of Arizona.  Between 2017 and 2018, Ms. Nokes purchased Neutrogena Beach Defense aerosol sunscreen at least two or three times from Publix and/or Walgreens retail stores located in Hilton Head Island, South Carolina. When purchasing the Affected Products, Ms. Nokes reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendant that the products were properly manufactured, free from defects, and safe for their intended use. Ms. Nokes relied on these representations and warranties in deciding to purchase the products and these

representations and warranties were part of the basis of the bargain in that she would not have purchased the Affected Products from Defendant if she had known that they were not, in fact, properly manufactured, free from defects, or safe for their intended use.

17.     Plaintiff Robert Botterill is a resident and citizen of the state of Maryland.  Since approximately 2017, Mr. Botterill purchased two to three bottles of Aveeno Protect + Refresh Sunscreen Spray per year.  Mr. Botterill purchased the products from Walmart retail locations in Frederick, Maryland and Eldersburg, Maryland, and CVS retail locations in Walkersville, Maryland and Ocean City, MD.  When purchasing the Affected Products, Mr. Botterill reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendant that the products were properly manufactured, free from defects, and safe for their intended use. Mr. Botterill relied on these representations and warranties in deciding to purchase the products and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Affected Products from Defendant if he had known that they were not, in fact, properly manufactured, free from defects, or safe for their intended use.

18.     Plaintiff Anna Swartz is a resident and citizen of the state of California.  Between June 2019 and May 2021, Ms. Swartz purchased approximately 10-15 bottles of Neutrogena Ultra Sheer aerosol sunscreen. Ms. Swartz purchased the products from Ross Dress for Less retail stores located in Kaneohe, Hawaii. When purchasing the Affected Products, Ms. Swartz reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendant that the products were properly manufactured, free from defects, and safe for their intended use. Ms. Swartz relied on these representations and warranties in deciding to purchase the products and these representations and warranties were part of the basis of the bargain in that she would not have purchased the Affected Products from Defendant if she had known that they were not, in fact, properly manufactured, free from defects, or safe for their intended use.

19.    Plaintiff Sophia Porter is a resident and citizen of the state of California.  Since in or around December 2020, Ms. Porter has purchased approximately 10 bottles of Neutrogena Ultra Sheer aerosol sunscreen from Target retail stores located in Los Angeles and West Hollywood, California, and a Walmart retail store located in Burbank, California.  When purchasing the Affected Products, Ms. Porter reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendant that the products were properly manufactured, free from defects, and safe for their intended use. Ms. Porter relied on these representations and warranties in deciding to purchase the products and these representations and warranties were part of the basis of the bargain in that she would not have purchased the Affected Products from Defendant if she had known that they were not, in fact, properly manufactured, free from defects, or safe for their intended use.

20.    Plaintiff Mike Xavier is a resident and citizen of the state of California.  Between approximately June 2018 through August 2020, Mr. Xavier purchased Neutrogena Beach Defense aerosol sunscreen multiple times from Walmart and Target retails stores located in Roseville, California.  When purchasing the Affected Products, Mr. Xavier reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendant that the products were properly manufactured, free from defects, and safe for their intended use. Mr. Xavier relied on these representations and warranties in deciding to purchase the products and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Affected Products from Defendant if he had known that they were not, in fact, properly manufactured, free from defects, or safe for their intended use.

21.    Plaintiff Frank Ortega is a resident and citizen of the state of California.  Between 2019 and June 2021, Mr. Ortega purchased approximately two to three bottles of Neutrogena CoolDry Sport aerosol sunscreen from a Target retail store located in Northridge California. When

purchasing the Affected Products, Mr. Ortega reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendant that the products were properly manufactured, free from defects, and safe for their intended use. Mr. Ortega relied on these representations and warranties in deciding to purchase the products and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Affected Products from Defendant if he had known that they were not, in fact, properly manufactured, free from defects, or safe for their intended use.

22.     Plaintiff Brian Slafter is a resident and citizen of the state of Illinois.  Between June 2020 and June 2021, Mr. Slafter purchased Neutrogena Ultra Sheer aerosol sunscreen and Neutrogena Beach Defense aerosol sunscreen from a Walmart retail store located in Centralia, Illinois.  When purchasing the Affected Products, Mr. Slafter reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendant that the products were properly manufactured, free from defects, and safe for their intended use. Mr. Slafter relied on these representations and warranties in deciding to purchase the products and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Affected Products from Defendant if he had known that they were not, in fact, properly manufactured, free from defects, or safe for their intended use.

23.     Plaintiff Heidi Humphreys is a resident and citizen of the state of Pennsylvania. Ms. Humphreys purchased Neutrogena Ultra Sheer aerosol sunscreen approximately one time per year for the last several years from a Walmart retail store located in Shrewsbury, Pennsylvania. When purchasing the Affected Products, Ms. Humphreys reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendant that the products were properly manufactured, free from defects, and safe for their intended use. Ms. Humphreys relied on these representations and warranties in deciding to purchase the products and these

representations and warranties were part of the basis of the bargain in that she would not have purchased the Affected Products from Defendant if she had known that they were not, in fact, properly manufactured, free from defects, or safe for their intended use.

24.     Plaintiff Michael Taillard is a resident and citizen of the state of Michigan.   Mr. Taillard purchased approximately 3 or 4 bottles of Neutrogena Beach Defense aerosol sunscreen from a Shop-N-Save retail store located in Benzonia, Michigan, most recently in August 2020. When purchasing the Affected Products, Mr. Taillard reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendant that the products were properly manufactured, free from defects, and safe for their intended use. Mr. Taillard relied on these representations and warranties in deciding to purchase the products and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Affected Products from Defendant if he had known that they were not, in fact, properly manufactured, free from defects, or safe for their intended use.

25.     Defendant J&J is a New Jersey corporation with its principal place of business and headquarters in located at One Johnson & Johnson Plaza, New Brunswick, New Jersey. At all relevant times hereto, Defendant was engaged in manufacturing, marketing, distributing, and advertising the Affected Products throughout the United States. Defendant created and/or authorized the false and misleading advertising and labeling of the Affected Products.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from the Defendant.

27.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in this State and regularly sells and markets its product in this State. Defendant derives substantial revenue from sales of its products in this State, with knowledge that its products are being marketed and sold for use in this State.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is headquartered here and conducts substantial business in this District.

## FACTUAL ALLEGATIONS

A.      **The Dangers of Benzene**

29.     The National Institute for Occupational Safety and Health ("NIOSH") defines benzene as a carcinogen.[15]

30.     According to the U.S. Centers for Disease Control and Prevention ("CDC"), the U.S. Department of Health and Human Services has determined that benzene causes cancer in humans. Similarly, the WHO and the IARC have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[16]

31.     The NIOSH and CDC identify "exposure routes" for benzene to include: "inhalation, skin absorption, ingestion, skin and/or eye contact."[17]

32.     The NIOSH and CDC identify "target organs" associated with human exposure to benzene to include: "eyes, skin, respiratory system, blood, central nervous system, bone marrow.[18]

---

[15] *Facts About Benzene,* CENTERS FOR DISEASE CONTROL AND PREVENTION (April 4, 2018) https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last visited July 29, 2021).
[16] David Light, Kaury Kucera, PhD, and Quian Wu, PhD, *Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products* (May 24, 2021), https://www.valisure.com/wp-content/uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf (last visited July 29, 2021).
[17] *NIOSH Pocket Guide to Chemical Hazards: Benzene*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/niosh/npg/npgd0049.html (last visited July 29, 2021).
[18] *Id.*

11

33.     The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."[19]

34.     As for "where benzene is found and how it is used," the CDC states that "[s]ome industries use benzene to make other chemicals that are used to make plastics, resins, and nylon and synthetic fibers. Benzene is also used to make some types of lubricants, rubbers, dyes, detergents, drugs, and pesticides."[20]

35.     The CDC has stated that ways in which people "could be exposed to benzene" include:

- Outdoor air contains low levels of benzene from tobacco smoke, gas stations, motor vehicle exhaust, and industrial emissions.

- Indoor air generally contains levels of benzene higher than those in outdoor air. The benzene in indoor air comes from products that contain benzene such as glues, paints, furniture wax, and detergents.

- The air around hazardous waste sites or gas stations can contain higher levels of benzene than in other areas.

- Benzene leaks from underground storage tanks or from hazardous waste sites containing benzene can contaminate well water.

- People working in industries that make or use benzene may be exposed to the highest levels of it.

- A major source of benzene exposure is tobacco smoke.[21]

---

[19] *Facts About Benzene,* CENTERS FOR DISEASE CONTROL AND PREVENTION (April 4, 2018) https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last visited July 29, 2021).
[20] *Id.*
[21] *Id.*

36.    A 2010 study titled "Advances in Understanding Benzene Health Effects and Susceptibility" summarized the epidemiological studies of the carcinogenic effects of benzene exposure and an overview of the hematotoxic effects of benzene.[22]  The 2010 study concluded:

   a.   There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion.

   b.   Exposure to benzene can lead to multiple alterations that contribute to the leukemogenic process, indicating a multimodal mechanism of action.

   c.   Benzene is a ubiquitous chemical in our environment that causes acute leukemia and probably other hematological cancers.

37.    The FDA currently recognizes the danger of benzene and, as a result, has claimed it should not be used in the manufacture of any component of a drug product due to its unacceptable toxicity effect.[23]

38.    Where the use of benzene or other Class 1 solvents is *unavoidable*, the FDA has stated that the levels should be restricted, and benzene is restricted under such guidance to 2 parts per million.[24]

---

[22] Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, ANNUAL REVIEWS, Vol. 31:133-148 (April 21, 2010) https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646 (last visited July 29, 2021).
[23] David Light, Kaury Kucera, PhD, and Quian Wu, PhD, *Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products* (May 24, 2021), https://www.valisure.com/wp-content/uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf (last visited July 29, 2021).
[24] *Id.*

39.     Because many of the products Valisure tested did not contain detectable levels of benzene, it does not appear that benzene use is unavoidable for their manufacture.[25]   As such, "[a]ny significant detection of benzene should be deemed unacceptable."[26]

40.     The FDA regulates sunscreens, including the Affected Products at issue here, as over-the-counter ("OTC") drugs rather than as cosmetics. The FDA regulates sunscreens to ensure they meet safety and effectiveness standards.  *See generally* 21 CFR §§ 352.1– 352.77.  The FDA requires sunscreen manufacturers to subject their products to certain testing before they are made available to any consumer.[27]

41.     The FDA has also identified acceptable active ingredients for products labeled as sunscreen.[28] Benzene is not one of those acceptable ingredients.[29]

42.     As such, the presence of this known human carcinogen in sunscreen products widely recommended for the prevention of skin cancer and regularly used by adults and children in large volumes makes the presence of benzene in sunscreen products especially troubling.

**B.     The Valisure Lab Report Identified High Levels of Benzene In Defendant's Products**

43.     Valisure analyzed 294 unique batches from 69 brands of sunscreen and after-sun care products.

---

[25] David Light, Kaury Kucera, PhD, and Quian Wu, PhD, *Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products* (May 24, 2021), https://www.valisure.com/wp-content/uploads/Valisure-Citizen-Petition-on-Benzene-in-Sunscreen-and-After-sun-Care-Products-v9.7.pdf (last visited July 29, 2021).

[26] *Id.*

[27] *Sunscreen: How to Help Protect Your Skin from the Sun*, U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/drugs/understanding-over-counter-medicines/sunscreen-how-help-protect-your-skin-sun (last visited July 29, 2021).

[28] *Id.*

[29] *Id.*

44.     Valisure identified fourteen sunscreen and after-sun care product or product line batches which contained levels of benzene at 2 ppm or higher.  Ten of the fourteen batches are manufactured by J&J:

| Brand Name | Type | Description | SPF | UPC | Lot | Exp. | Active Pharmaceutical Ingredient(s) | Benzene Avg ppm | % St Dev |
|---|---|---|---|---|---|---|---|---|---|
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 04820E04 | 2022-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 6.26 6.77* | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 07020E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.96 | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 06920E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.76 | 5% |
| Sun Bum | Gel | Cool Down Gel | N/A | 871760002005 | S0082C | – | N/A (Cosmetic Product) | 5.33 5.49* | 3% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 02320E01 | 2022-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.30 | 2% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 04721E02 | 2023-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 5.20 5.59* | 5% |
| CVS Health | Spray | After-sun Aloe Vera Soothing Spray | N/A | 050428390832 | 8140449A | – | N/A (Cosmetic Product) | 4.71 4.55* | 1% |
| Neutrogena | Spray | Invisible Daily Defense Body Sunscreen Broad Spectrum SPF 60+ | 60+ | 086800111542 | 04921E01 | 2024-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10% | 4.65 5.27* | 4% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 03120E02 | 2021-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.11 6.00** | 15% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 28020E01 | 2022-09 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.01 4.00* | 4% |
| CVS Health | Spray | After-sun Aloe Vera Soothing Spray | N/A | 050428390832 | 4111849A | – | N/A (Cosmetic Product) | 3.58 3.93* | 4% |
| Neutrogena | Spray | Beach Defense Spray Body Sunscreen SPF 50 | 50 | 086800112549 | 25520E01 | 2023-08 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10% | 3.52 3.71* | 3% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 31420E04 | 2022-10 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 3.08 2.64* | 2% |
| Fruit of the Earth | Gel | Aloe Vera Gel | N/A | 071661001200 | 6612940A | – | N/A (Cosmetic Product) | 2.78 2.94* | 6% |

45.     In fact, Defendant's products had the highest levels of benzene detected in any of the sunscreen products tested by Valisure.

46.     The *lowest* level of benzene found in the Neutrogena products listed in the chart above is 2.64 ppm (Beach Defense Oil-Free Body Sunscreen Spray - SPF 100), or 32% higher than the 2 ppm concentration limit for "unavoidable" uses.

47.     The *highest* level of benzene found in the Neutrogena products listed in the chart above is 6.77 ppm (Ultra Sheer Weightless Sunscreen Spray, SPF 100+), or more than 3 times the concentration limit for "unavoidable" uses.

48.     In the face of the Valisure report, albeit almost two months after the findings were made public, J&J announced that the "only sunscreen products impacted are aerosol products":

- NEUTROGENA® Beach Defense® aerosol sunscreen;
- NEUTROGENA® Cool Dry Sport aerosol sunscreen;
- NEUTROGENA® Invisible Daily™ defense aerosol sunscreen;
- NEUTROGENA® Ultra Sheer® aerosol sunscreen;[30] and
- AVEENO® Protect + Refresh aerosol sunscreen."[31]

49.     The two-month delay spanned two major holiday weekends, Memorial Day weekend and July 4th weekend, events which Defendant reasonably expected would elevate consumer demand for and sales of sunscreen products.

50.     J&J claims that its "medical safety team worked with external experts to conduct a health and safety assessment of these aerosol sunscreen products."[32]

51.     As part of its media and public relations announcements that followed the publicized Valisure report, J&J did not link its referenced "health and safety assessments."

52.     J&J also claims that "daily exposure to benzene in these aerosol sunscreen products at the levels detected in our testing would not be expected to cause adverse health consequences."[33]

53.     As part of its media and public relations announcements that followed the publicized Valisure report, J&J did not link its referenced "testing."

---

[30] Press Release, JOHNSON & JOHNSON, *Johnson & Johnson Consumer Inc. Issues Voluntary Recall of Specific NEUTROGENA® and AVEENO® Aerosol Sunscreen Products Due to the Presence of Benzene* (July 14, 2021) (https://www.jnj.com/johnson-johnson-consumer-inc-issues-voluntary-recall-of-specific-neutrogena-and-aveeno-aerosol-sunscreen-products-due-to-the-presence-of-benzene) (last visited July 29, 2021); Press Release, NEUTROGENA®, *Aerosol Sunscreen Voluntary Recall Statement* (https://www.neutrogena.com/sunscreen-recall.html) (last visited July 29, 2021), (Neutrogena-specific announcement).

[31] Press Release, AVEENO®, *Sunscreen Recall* https://www.aveeno.com/sunscreen-recall (last visited July 29, 2021).

[32] Press Release, NEUTROGENA®, *Aerosol Sunscreen Voluntary Recall Statement* (https://www.neutrogena.com/sunscreen-recall.html) (last visited July 29, 2021).

[33] Press Release, JOHNSON & JOHNSON, *Johnson & Johnson Consumer Inc. Issues Voluntary Recall of Specific NEUTROGENA® and AVEENO® Aerosol Sunscreen Products Due to the Presence of Benzene* (July 14, 2021) (https://www.jnj.com/johnson-johnson-consumer-inc-issues-voluntary-recall-of-specific-neutrogena-and-aveeno-aerosol-sunscreen-products-due-to-the-presence-of-benzene) (last visited July 29, 2021); *Voluntary Aerosol Sunscreen Product Recall*, https://www.neutrogena.com/on/demandware.static/-/Library-Sites-JNJSharedLibrary/default/dwea9de690/USAerosolSunscreenProductList.pdf (last visited July 29, 2021), (product list, by product lot and expiration).

54.     Instead, what was included in J&J's media and public relations announcements that followed the publicized Valisure report, was: "We are investigating the cause of this issue, which is limited to certain aerosol sunscreen products."

55.     The presence of benzene in the Affected Products is not disclosed on the Affected Products' labels.  Therefore, Plaintiffs, by use of reasonable care, could not have discovered that the Affected Products were contaminated with Benzene.

56.     By marketing and selling its sunscreen products in the stream of commerce with the intent that its Affected Products would be purchased by Plaintiffs and the Classes, Defendant warrants that the Affected Products are sunscreens to be used for sun protection, rather than adulterated sunscreens containing dangerous chemicals.

C.     **Defendant's False and Misleading Advertising Campaign**

57.     Benzene is not listed on the Affected Product labels as either an active or inactive ingredient, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Affected Products.

58.     Rather, Defendant has long represented that its Neutrogena products are "#1 Dermatologist Recommended" and its Aveeno products are "Dermatologist Recommended." These claims remain unchanged despite Valisure's discovery of benzene in the Affected Products.

59.     Defendant's advertising and packaging also emphasize the products' safety and health benefits. For example, in its packaging and advertising for its Neutrogena Ultra Sheer products, which is among the Affected Products, Defendant repeatedly describes the products as "clean."

60.     Defendant also touts itself as "[l]eading the way" in product testing.  On its webpage that is dedicated to its allegedly high product-testing standards, Defendant states, "We set a high bar for using ingredients. Our ingredients are screened for quality, manufacturing

process, government regulations, published research, and our own ingredient safety databases."[34] Defendant also claims that "[s]afety doesn't end with placing the products on the shelf. Our experts are continuously monitoring and adjusting the process based on the latest research, guidance, regulations, customer, and consumer feedback."[35]

61.     Similarly, on its Aveeno website, Defendant claims that "'Good enough' is never good enough for Aveeno®.  Our internal standards for safety testing and ingredient quality far exceed those set by regulators around the world."[36]

62.     Defendant's advertising campaign is false and misleading.  The presence of benzene in the Affected Products render the products illegal and unfit for sale in trade or commerce.  Plaintiffs would not have purchased the Affected Products had they been truthfully and accurately labeled.

## CLASS ACTION ALLEGATIONS

63.     Plaintiffs bring this action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of the following Classes:

> All persons who purchased one or more of Defendant's Affected Products in the United States for personal/household use within any applicable limitations period (the "Nationwide Class").

64.     Plaintiffs Porter, Xavier, and Ortega bring this action individually and on behalf of the following California subclass:

> All persons who purchased one or more of Defendant's Affected Products in the state of California for personal/household use within any applicable limitations (the "California Subclass").

65.     Plaintiff Swartz brings this action individually and on behalf of the following

---

[34] *Neutrogena Product Testing*, https://www.neutrogena.com/producttesting.html (last visited July 29, 2021).
[35] *Id.*
[36] *About Aveeno*, https://www.aveeno.com/about (last visited July 29, 2021).

Hawaii subclass:

> All persons who purchased one or more of Defendant's Affected Products in the state of Hawaii for personal/household use within any applicable limitations (the "Hawaii Subclass").

66.     Plaintiff Slafter brings this action individually and on behalf of the following

Illinois subclass:

> All persons who purchased one or more of Defendant's Affected Products in the state of Illinois for personal/household use within any applicable limitations (the "Illinois Subclass").

67.     Plaintiff Nokes brings this action individually and on behalf of the following South

Carolina subclass:

> All persons who purchased one or more of Defendant's Affected Products in the state of South Carolina for personal/household use within any applicable limitations (the "South Carolina Subclass").

68.     Plaintiff Botterill brings this action individually and on behalf of the following

Maryland subclass:

> All persons who purchased one or more of Defendant's Affected Products in the state of Maryland for personal/household use within any applicable limitations (the "Maryland Subclass").

69.     Plaintiff Taillard brings this action individually and on behalf of the following

Michigan subclass:

> All persons who purchased one or more of Defendant's Affected Products in the state of Michigan for personal/household use within any applicable limitations (the "Michigan Subclass").

70.     Plaintiff Humphreys brings this action individually and on behalf of the following

Pennsylvania subclass:

> All persons who purchased one or more of Defendant's Affected Products in the state of Pennsylvania for personal/household use within any applicable limitations (the "Pennsylvania Subclass").

71.     Plaintiff Baker brings this action individually and on behalf of the following

Vermont subclass:

> All persons who purchased one or more of Defendant's Affected Products in the state of Vermont for personal/household use within any applicable limitations (the "Vermont Subclass").

72.    Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and its current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of Affected Products.

73.    Numerosity (Rule 23(a)(1)): The exact number of members of the Class is unknown and currently unavailable to Plaintiffs, but joinder of individual members herein is impractical. The Class is likely comprised of thousands of consumers. The precise number of Class members, and their addresses, is unknown to Plaintiffs at this time, but can be ascertained from Defendant's records and/or retailer records. The members of the Class may be notified of the pendency of this action by mail or email, Internet postings and/or publications, and supplemented (if deemed necessary or appropriate by the Court) by published notice.

74.    Predominant Common Questions (Rule 23(a)(2) and (b)(3)): The Class' claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. The common and legal questions include, but are not limited to, the following:

    a.    Whether the Affected Products contain benzene;

    b.    Whether Defendant knew or should have known that the Affected Products contain benzene;

    c.    Whether Defendant's representations and omissions, in its marketing,

advertising, labeling, and packaging of the Affected Products, are misleading;

d.  Whether Defendant's representations and omissions, in its marketing, advertising, labeling, and packaging of the Affected Products are reasonably likely to deceive;

e.  Whether Defendant engaged in false and misleading advertising;

f.  Whether Defendant had knowledge that those representations were false, deceptive, and/or misleading;

g.  Whether Defendant's internal testing showed that its products contained benzene;

h.  Whether Defendant violated the state consumer protection statutes alleged herein;

i.  Whether Defendant breached its express warranties;

j.  Whether Defendant breached its implied warranties;

k.  Whether Defendant was unjustly enriched;

l.  Whether Defendant has the capability to implement changes to processes, practices, and policies regarding testing its products for contaminants, including, but not limited to benzene; and

m.  The nature of relief, including damages and equitable relief, to which Plaintiffs and members of the Class are entitled.

75.  Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all other Class Members, purchased the Affected Products, suffered damages as a result of that purchase, and seek the same relief as the proposed Class Members.

76.     Adequacy of Representation (Rule 23(a)(4)): Plaintiffs adequately represent the Class because their interests do not conflict with the interests of the members of the Class, and they have retained counsel competent and experienced in complex class action and consumer litigation. Plaintiffs and their counsel will fairly and adequately protect the interest of the members of the Class.

77.     Superiority (Rule 23(b)(3)): A class action is superior to other available means of adjudication for this controversy. It would be impracticable for members of the Class to individually litigate their own claims against Defendant because the damages suffered by Plaintiffs and the members of the Class are relatively small compared to the cost of individually litigating their claims. Individual litigation would create the potential for inconsistent judgments and delay and expenses to the court system. A class action provides an efficient means for adjudication with fewer management difficulties and comprehensive supervision by a single court.

78.     Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)): In the alternative, this action may properly be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for the Defendant; or the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

## COUNT I

**BREACH OF EXPRESS WARRANTY**
**(On behalf of Plaintiffs and the Class (or alternatively, the Subclasses) against Defendant)**

79.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

80.     Defendant marketed and sold its sunscreen products in the stream of commerce with the intent that its Affected Products would be purchased by Plaintiffs and the Classes.

81.     In connection with the sale of the Affected Products, Defendant, as the designer, manufacturer, marketer, distributor, and/or seller issued written warranties by representing that the Affected Products were sunscreens that contained only those active and inactive ingredients listed on the Products' labels. Those active and inactive ingredients do not include benzene, a known human carcinogen. Defendant further expressly warrants that the Affected Products are sunscreens used for sun protection, rather than adulterated sunscreens containing dangerous chemicals.

82.     The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

83.     Plaintiffs, by use of reasonable care, could not have discovered the breached warranty and realized the hidden increased risks and unreasonable dangers of using the Affected Products.

84.     As a direct and proximate cause of Defendant's breach of express warranty, Plaintiffs and the Class members have been injured and harmed because they would not have purchased the products had they known the true facts regarding the benzene content.

23

85.     On July 22, 2021, prior to filing this action, Defendant was served with a pre-suit notice letter pursuant to U.C.C. §§ 2-313 and 2-607.

## COUNT II

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
**(On behalf of Plaintiffs and the Class (or alternatively, the Subclasses) against Defendant)**

86.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

87.     When sold by Defendant, the Affected Products were not merchantable, did not pass without objection in the trade under the label description, were not of adequate quality within that description, were not fit for the ordinary purposes for which such goods are used, and did not conform to the promises or affirmations of fact made on its container or label.

88.     Unbeknownst to them, at the time the Plaintiffs and Class members purchased the Affected Products, they were not safe for use as sunscreen products.

89.     Because of the presence of benzene in the Affected Products, these products do create a present economic injury to Plaintiffs and the putative class because their sale should never have occurred.

90.     As a direct or proximate result of Defendant's Affected Products being unfit for their intended purpose and/or otherwise not merchantable, Plaintiffs and the putative Class have suffered actual damages because they would not have purchased the products had they known the true facts regarding the benzene content.

## COUNT III

### NEW JERSEY CONSUMER FRAUD ACT
### N.J. Stat. Ann. § 56:8-1 *et seq.*
**(On behalf of Plaintiffs and the Nationwide Class against Defendant)**

91.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

92.     Plaintiffs brings this count on behalf of themselves and all members of the Class that purchased an Affected Product, including those who purchased in the State of New Jersey.

93.     Plaintiffs, other members of the Nationwide Class, and Defendant are "persons" as defined by N.J. Stat. Ann. § 56:8-1(d).

94.     Defendant sells "merchandise," as defined by N.J. Stat. Ann. § 56:8-1(c) & (e).

95.     Defendant maintains a principal place of business within the State of New Jersey.

96.     The New Jersey Consumer Fraud Act ("NJCFA") declares that "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate . . . whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . ." N.J.S.A. §§ 56:8-2.

97.     Defendant has engaged in unfair or deceptive acts or practices that violated N.J.S.A. §§ 56:8-2, *et seq*., as described above, by, among other things, representing that the Affected Products have characteristics, uses, benefits, and qualities which they do not have; representing that the Affected Products are of a particular standard, quality, and grade when they are not; and advertising the Affected Products with the intent not to sell them as advertised.

98.     Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

99.     Defendant intended to mislead Plaintiffs and the Class members and induce them to rely on its misrepresentations and omissions.

100.     Plaintiffs and the Nationwide Class members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and misleading and that the Affected Products contain benzene and are not safe for use.

101.     Plaintiffs and members of the Class suffered injury in fact and lost money as a result of Defendant's conduct. Defendant falsely and misleadingly represented that Affected Products were healthy and safe for consumers, while omitting to disclose that they contained the carcinogen benzene. The presence of benzene rendered the Affected Products unsafe, adulterated, and misbranded. Had Plaintiffs and members of the Class known the truth about the Affected Products, they would not have purchased the Affected Products.

102.     Defendant's actions are deceptive and in clear violation of NJCFA, entitling Plaintiffs and members of the Classes to treble damages and relief under N.J.S.A. § 56:8-19.

103.     Accordingly, Plaintiffs seek all damages, injunctive and equitable relief, and attorneys' fees and costs available under the NJCFA.

## COUNT IV

### VERMONT CONSUMER FRAUD ACT
### VT. Stat. Ann. Tit. 9, § 2451 et seq.
### (On behalf of Plaintiff Baker and the Vermont Subclass against Defendant)

104.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

105.     Plaintiff Baker brings this count on behalf of himself and all members of the Class that purchased an Affected Product in Vermont

106.     Plaintiff and Vermont Subclass members are "consumers," as defined by VT. Stat. Ann. Tit. 9, § 2451a(a).

107.     Defendant's conduct as alleged herein related to "goods" or "services" for personal, family, or household purposes, as defined by VT. Stat. Ann. Tit. 9, § 2451a(b).

108.    Defendant is a "seller," as defined by VT. Stat. Ann. Tit. 9, § 2451a(c).

109.    Defendant advertised, offered, or sold goods or services in Vermont and engaged in trade or commerce directly or indirectly affecting the people of Vermont.

110.    Defendant engaged in unfair and deceptive acts or practices, in violation of VT. Stat. Tit. 9, § 2453(a), as described herein.

111.    Defendant intended to mislead Plaintiff Baker and Vermont Subclass members and induce them to rely on its misrepresentations and omissions.

112.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

113.    Under the circumstances, consumers had a reasonable interpretation of Defendant's representations and omissions.

114.    Defendant had a duty to disclose material facts to consumers, including but not limited to, that the Affected Products contain benzene, a known human carcinogen, and are unsafe for use. These material facts should have been disclosed because they were contrary to Defendant's representations about the Affected Products.

115.    Defendant's acts and practices caused or were likely to cause substantial injury to consumers, which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

116.    The injury to consumers was and is substantial because it was non-trivial and nonspeculative; and involved a concrete monetary injury. The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

117.    Consumers could not have reasonably avoided injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of

consumer decision-making. By withholding important information from consumers, Defendant created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

118.    Defendant's business practices had no countervailing benefit to consumers or to competition.

119.    Defendant is presumed, as a matter of law under VT. Stat. Ann. Tit. 9, § 2457, to have intentionally violated the Vermont Consumer Protection Act because it failed to sell goods or services in the manner and of the nature advertised or offered.

120.    Defendant acted intentionally, knowingly, and maliciously to violate Vermont's Consumer Fraud Act, and recklessly disregarded Plaintiffs' and Vermont Subclass members' rights.

121.    As a direct and proximate cause of Defendant's deceptive acts and practices, Plaintiff Baker and the Vermont Subclass members have been injured and harmed because they would not have purchased the Affected Products on the same terms if they knew the true facts regarding the benzene content.

## COUNT V

### MICHIGAN CONSUMER PROTECTION ACT
### Mich. Comp. Laws Ann. § 445.903 et seq.
### (On behalf of Plaintiff Taillard and the Michigan Subclass against Defendant)

122.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

123.    Plaintiff Taillard brings this count on behalf of himself and all members of the Class that purchased an Affected Product in Michigan.

124.    Defendant, Plaintiff Taillard, and absent Michigan Subclass members are "persons" as defined by Mich. Comp. Laws Ann. § 445.903(d).

125.    Defendant advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.903(g).

126.    Defendant engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including: (a) representing that its goods and services have characteristics, uses, and benefits that they do not have, in violation of Mich. Comp. Laws Ann. § 445.903(1)(c); (b) representing that its goods and services are of a particular standard or quality if they are of another, in violation of Mich. Comp. Laws Ann. § 445.903(1)(e); (c) making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws Ann. § 445.903(1)(bb); and (d) failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter, in violation of Mich. Comp. Laws Ann. § 445.903(1)(cc).

127.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

128.    Defendant intended to mislead Plaintiffs and Michigan Subclass members and induce them to rely on its misrepresentations and omissions.

129.    As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Taillard and absent Michigan Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Affected Products.

## COUNT VI

**PENNSYLVANIA UNFAIR TRADE PRACTICES AND**
**CONSUMER PROTECTION LAW**
**73 Pa. Cons. Stat. §§ 201-2 & 201-3, *et seq.***
**(On behalf of Plaintiff Humphreys and the Pennsylvania Subclass against Defendant)**

130.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

131.    Plaintiff Humphreys brings this count on behalf of herself and all members of the Class that purchased an Affected Product in Pennsylvania.

132.    Defendant is a "person" as meant by 73 Pa. Cons. Stat. § 201-2(2).

133.    Plaintiff Humphreys and absent Pennsylvania Subclass members purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

134.    Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of 73 Pa. Cons. Stat. § 201-3, including the following: representing that its goods and services have characteristics, uses, benefits, and qualities that they do not have (73 Pa. Cons. Stat. § 201-2(4)(v)); representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Cons. Stat. § 201-2(4)(vii)); and advertising its goods and services with intent not to sell them as advertised (73 Pa. Cons. Stat. § 201-2(4)(ix)).

135.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

136.    Defendant intended to mislead Plaintiff Humphreys and Pennsylvania Subclass members and induce them to rely on its misrepresentations and omissions.

137.    Had Defendant disclosed to Plaintiff Humphreys and Pennsylvania Subclass members material facts, including but not limited to, that the Affected Products contain benzene and are not safe for use as sunscreen, Defendant would have been unable to sell as many Affected Products that it did or at the price such Affected Products were sold.

138.    As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Humphreys and Pennsylvania Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Affected Products.

139.    Plaintiff Humphreys and Pennsylvania Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $100 (whichever is greater), treble damages, attorneys' fees and costs, and any additional relief the Court deems necessary or proper.

## COUNT VII

### SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### S.C. Code Ann. § 39-5-10 et seq.
### (On behalf of Plaintiff Nokes and the South Carolina Subclass against Defendant)

140.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

141.    Plaintiff Nokes brings this count on behalf of herself and all members of the Class that purchased an Affected Product in South Carolina.

142.    Defendant is a "person," as defined by S.C. Code Ann. § 39-5-10(a).

143.    South Carolina's Unfair Trade Practices Act (SC UTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20.

144.    Defendant advertised, offered, or sold goods or services in South Carolina and engaged in trade or commerce directly or indirectly affecting the people of South Carolina, as defined by S.C. Code Ann. § 39-5-10(b).

145.    Defendant's acts and practices had, and continue to have, the tendency or capacity to deceive.

146.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

147.    Defendant intended to mislead Plaintiff Nokes and South Carolina Subclass members and induce them to rely on its misrepresentations and omissions.

148.    Defendant had a duty to disclose material facts to Plaintiff Humphreys and the South Carolina Subclass given their relationship as contracting parties and intended users of the Affected Products.  Defendant also had a duty to disclose material facts to Plaintiff Humphreys and the South Caroline Subclass, namely that it was in fact manufacturing, distributing, and selling harmful products unfit for human use, because Defendant had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

149.    Had Defendant disclosed to Plaintiff Nokes and South Carolina Subclass members material facts, including but not limited to, that the Affected Products contain benzene and are not safe for use as sunscreen, Defendant would have been unable to sell as many Affected Products that it did or at the price such Affected Products were sold.

150.    Defendant's business acts and practices offend an established public policy, or are immoral, unethical, or oppressive.

151.    Defendant's unfair and deceptive acts or practices adversely affected the public interest because such acts or practices have the potential for repetition; Defendant engages in such

acts or practices as a general rule; and such acts or practices impact the public at large, including the South Carolina Subclass members that purchased and/or used an Affected Product.

152.    Defendant's policies and procedures create the potential for recurrence of the complained-of business acts and practices.

153.    Defendant's violations present a continuing risk to Plaintiff Nokes and absent South Carolina Subclass members as well as to the general public.

154.    As a direct and proximate result of Defendant's deceptive acts and practices in the State of South Carolina, Plaintiff Nokes and South Carolina Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Affected Products.

155.    Plaintiff Nokes and South Carolina Subclass members seek all monetary and non-monetary relief allowed by law, including damages for their economic losses, treble damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT VIII

### MARYLAND CONSUMER PROTECTION ACT
### Md. Comm. Code § 13-301 *et seq.*
### (On behalf of Plaintiff Botterill and the Vermont Subclass against Defendant)

156.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

157.    Plaintiff Botterill brings this count on behalf of himself and all members of the Class that purchased an Affected Product in Maryland.

158.    Defendant is a person as defined by Md. Comm. Code § 13-101(h).

159.    Defendant's conduct as alleged herein related to "sales," "offers for sale," or "bailment" as defined by Md. Comm. Code §§ 13-101(i) and 13-303.

160.     Maryland Subclass members are "consumers" as defined by Md. Comm. Code § 13-101(c).

161.     Defendant advertises, offers, or sell "consumer goods" or "consumer services" as defined by Md. Comm. Code § 13-101(d).

162.     Defendant advertised, offered, or sold goods or services in Maryland and engaged in trade or commerce directly or indirectly affecting the people of Maryland.

163.     Defendant engaged in unfair and deceptive trade practices, in violation of Md. Comm. Code § 13-301, including: (a) false or misleading oral or written representations that have the capacity, tendency, or effect of deceiving or misleading consumers; (b) representing that consumer goods or services have a characteristic that they do not have; (c) representing that consumer goods or services are of a particular standard, quality, or grade that they are not; (d) failing to state a material fact where the failure deceives or tends to deceive; (e) advertising or offering consumer goods or services without intent to sell, lease, or rent them as advertised or offered; (f) deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of consumer goods or services or the subsequent performance with respect to an agreement, sale lease or rental.

164.     Defendant engaged in these unfair and deceptive trade practices in connection with offering for sale or selling consumer goods or services or with respect to the extension of consumer credit, in violation of Md. Comm. Code § 13-303.

165.     Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

166.     Defendant intended to mislead Plaintiff Botterill and Maryland Subclass members and induce them to rely on its misrepresentations and omissions.

167.    Had Defendant disclosed to Plaintiff Botterill and Maryland Subclass members material facts, including but not limited to, that the Affected Products contain benzene and are not safe for use as sunscreen, Defendant would have been unable to sell as many Affected Products that it did or at the price such Affected Products were sold.  Plaintiff Botterill and absent Maryland Subclass members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

168.    As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Botterill and absent Maryland Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Affected Products.

169.    Plaintiff Botterill and Maryland Subclass members seek all monetary and non-monetary relief allowed by law, including damages, disgorgement, injunctive relief, and attorneys' fees and costs.

## COUNT IX

### HAWAII UNFAIR PRACTICES AND UNFAIR COMPETITION ACT
### Haw. Rev. Stat. § 480-1 *et seq.*
### (On behalf of Plaintiff Swartz and the Hawaii Subclass against Defendant)

170.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

171.    Plaintiff Swartz brings this count on behalf of herself and all members of the Class that purchased an Affected Product in Hawaii.

172.    Plaintiff Swartz and Hawaii Subclass members are "consumers" as defined by Haw. Rev. Stat. § 480-1.

173.    Plaintiff Swartz, Hawaii Subclass members, and Defendant are "persons" as

defined by Haw. Rev. Stat. § 480-1.

174. Defendant advertised, offered, or sold goods or services in Hawaii and engaged in trade or commerce directly or indirectly affecting the people of Hawaii.

175. Defendant engaged in unfair or deceptive acts or practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the goods and services purchased by Hawaii Subclass members in violation of Haw. Rev. Stat. § 480-2(a).

176. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

177. Defendant intended to mislead Plaintiff Swartz and Hawaii Subclass members and induce them to rely on its misrepresentations and omissions.

178. The foregoing unlawful and deceptive acts and practices were immoral, unethical, oppressive, and unscrupulous.

179. As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Swartz and Hawaii Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Affected Products.

180. Plaintiff Swartz and Hawaii Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, benefit of the bargain damages, treble damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT X

**ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
815 ILL. COMP. STAT. §§ 505 *et seq.***
**(On behalf of Plaintiff Slafter and the Hawaii Subclass against Defendant)**

181.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

182.     Plaintiff Slafter brings this count on behalf of himself and all members of the Class that purchased an Affected Product in Illinois.

183.     Defendant is a "person" as defined by 815 ILCS §§ 505/1(c).

184.     Plaintiff Slafter and Illinois Subclass members are "consumers" as defined by 815 ILCS §§ 505/1(e).

185.     Defendant's conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 ILCS § 505/1(f).

186.     Defendant's conduct as described herein was deceptive, unfair, and unlawful trade acts or practices, in violation of 815 ILCS § 505/2.

187.     Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

188.     Defendant intended to mislead Plaintiff Slafter and Illinois Subclass members and induce them to rely on its misrepresentations and omissions.

189.     The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any benefit to consumers or to competition.

190.     As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Slafter and absent Illinois Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Affected Products.

191.    Plaintiff Slafter and Illinois Subclass members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT XI

**CALIFORNIA'S UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200, et seq.**
**(On behalf of Plaintiffs Porter, Xavier, and Ortega and the California Subclass against Defendant)**

192.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

193.    Plaintiff Porter, Xavier, and Ortega (the "California Plaintiffs") bring this count on behalf of themselves and all members of the Class that purchased an Affected Product in California.

194.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

195.    Defendant violated Cal. Bus. & Prof. Code § 17200 *et seq*. by engaging in unlawful, unfair, and deceptive business acts and practices.

196.    Defendant's manufacturing, marketing, distributing, and selling of the Affected Products violates California's Sherman Food, Drug, and Cosmetics Law, Cal. Health & Safety Code § 111225, *et seq.* ("Sherman Law").

197.    The relevant part of the Sherman Law declares that a drug is misbranded if its labeling is false or misleading in any particular way and further provides that it is unlawful for any person to misbrand any drug.  Cal. Health & Safety Code §§ 111330, 111440, 111445.  The Sherman Law defines a "person" as "any individual, firm, partnership, trust, corporation, limited liability company, company, estate, public or private institution, association, organization, group, city, county, city and county, political subdivision of this state, other governmental agency within

38

the state and any representative, agent, or agency of any of the foregoing." Cal. Health & Safety Code § 109995. Defendant is a corporation and, therefore, a "person" within the meaning of the Sherman Act.

198.   The business practices alleged above are unlawful under the Consumers Legal Remedy Act, Cal. Civ. Code § 1750, et seq. ("CLRA"), which forbids deceptive advertising.

199.   There is no benefit to consumers or competition by deceptively marketing sunscreen products. Indeed, the harm to consumers and competition caused by Defendant's deceptive marketing of the Affected Products is substantial.

200.   California Plaintiffs and other members of the California Subclass class had no way of knowing that the Affected Products they bought were not actually as marketed. Thus, they could not have reasonably avoided the injury each of them suffered.

201.   The gravity of the consequences of Defendant's conduct as described above outweighs any justification, motive or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and it is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to California Plaintiffs and other members of the California Subclass.

202.   Defendant's deceptive marketing of the Affected is likely to deceive reasonable consumers. Indeed, the California Plaintiffs and other members of the California Subclass were unquestionably deceived regarding the true danger of the Affected Products, as Defendant's marketing of the Products nowhere discloses that the Products may contain benzene, but instead portrays the Affected Products as safe and healthy. Said acts are deceptive business acts and practices.

203.   This deception caused California Plaintiffs and other members of the California Subclass to purchase the Affected Products. Had they known and understood the true nature and

quality of the Affected Products, California Plaintiffs and other members of the California Subclass would not have purchased the Affected Products.

204. As a result of the business practices described above, Business and Professions Code § 17203 entitles California Plaintiffs and other members of the California Subclass to an order enjoining such future conduct on the part of Defendant and such other solely injunctive or declaratory relief which may be necessary as a result of Defendant's wrongful conduct.

205. The above-described unlawful business acts and practices, and each of them, present a threat and reasonable likelihood of deception to California Plaintiffs and other members of the California Subclass in that Defendant has systematically perpetrated and continues to perpetrate such acts or practices on California Plaintiffs and other members of the California Subclass by means of its deceptive manufacturing, marketing, distributing, and selling of the Affected Products

## COUNT XII

**CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**Cal. Civ. Code § 1750, *et seq*.**
**(On behalf of Plaintiffs Porter, Xavier, and Ortega and the California Subclass against Defendant)**

206. Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

207. Plaintiff Porter, Xavier, and Ortega (the "California Plaintiffs") bring this count on behalf of themselves and all members of the Class that purchased an Affected Product in California.

208. This cause of action is brought pursuant to the CLRA. The CLRA is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property, or services to consumers primarily for personal, family, or household use.

209.   Defendant is a "person" as defined by Cal. Civil Code §§ 1761(c) and 1770 and has provided "goods" as defined by Civil Code §§ 1761(a) and 1770.

210.   California Plaintiffs are "consumers" under Cal. Civ. Code § 1761(d) and have suffered damage as a result of Defendant's acts and practices as set forth below, which are unlawful under Cal. Civ. Code § 1770(a).

211.   Defendant's acts and practices were intended to and did result in the sales of goods and services to Plaintiffs and the California Subclass members in violation of Cal. Civil Code § 1770, including:

   a. Representing that the Affected Products have characteristics, uses, and/or benefits which they do not, in violation of Cal. Civ. Code § 1770(a)(5);

   b. Representing that the Affected Products were of a particular standard, quality, or grade which they are not, in violation of Cal. Civ. Code § 1770(a)(7);

   c. Advertising the Affected Products with the intent not to sell them as advertised, in violation of Cal. Civ. Code § 1770(a)(9); and

   d. Representing that the Affected Products have been supplied in accordance with previous representations when they have not, in violation of Cal. Civ. Code § 1770(16).

212.   California Plaintiffs request that this Court enjoin Defendant from continuing to employ the unlawful methods, acts, and practices alleged herein, and any other solely declaratory or injunctive relief the Court deems proper pursuant to Cal. Civ. Code §§ 1780 and 1781.  If Defendant is not restrained from engaging in these types of practices on the future, California Plaintiffs and other members of the California Subclass will continue to suffer harm.

## COUNT XIII

### UNJUST ENRICHMENT
**(On behalf of the Plaintiffs and the Class (or alternatively, the Subclasses) against Defendant)**

213.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

214.    Plaintiffs and Class members conferred benefits upon Defendant. Plaintiffs and Class members paid money for Defendant's worthless and defective Affected Products.

215.    Defendant has unjustly retained the benefits conferred upon by Plaintiffs and Class members.

216.    Defendant retained those benefits under circumstances that make it inequitable for Defendant to retain such benefits. Specifically, Defendant retained those benefits even though Defendant's Affected Products contain benzene and are unfit and unsafe for human use. If Plaintiffs and Class members had known the true nature of Defendant's Affected Products, they would not have purchased the products. Plaintiffs and Class members are therefore entitled to disgorgement and/or restitution as prayed for hereunder.

217.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and members of the Class is unjust and inequitable, Defendant must pay restitution to Plaintiffs and members of the Class for its unjust enrichment, as ordered by the Court.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Classes, pray for relief and judgment against Defendant as follows:

a.    Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

b.      Awarding Plaintiffs and the Classes compensatory damages, in an amount exceeding $5,000,000, to be determined by proof;

c.      Awarding Plaintiffs and the Classes appropriate relief, including but not limited to actual damages;

d.      For declaratory and equitable relief, including restitution and disgorgement;

e.      For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

f.      Awarding Plaintiffs and the Classes the costs of prosecuting this action, including expert witness fees;

g.      Awarding Plaintiffs and the Classes reasonable attorneys' fees and costs as allowable by law;

h.      Awarding pre-judgment and post-judgment interest;

i.      For punitive damages; and

j.      Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all claims so triable.

Dated: July 30, 2021

Respectfully submitted,

/s/ James E. Cecchi
James E. Cecchi, Esq.
Kevin G. Cooper, Esq.
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: JCecchi@carellabyrne.com
        KCooper@carellabyrne.com

**LEVI & KORSINSKY, LLP**
Mark S. Reich
Courtney E. Maccarone
55 Broadway, 10th Floor
New York, NY 10006
Telephone: 212-363-7500
Facsimile: 212-363-7171
Email: mreich@zlk.com
        cmaccarone@zlk.com

*Counsel for Plaintiffs*